**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0537-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TYRIE R. BULLOCK,

     Defendant-Appellant.

_____

Submitted February 16, 2022 – Decided June 21, 2022

Before Judges Whipple and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-09-2609.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Lauren Bonfiglio, Deputy Attorney General, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant appeals from his guilty plea convictions for first-degree aggravated manslaughter and possession of a handgun. The prosecution arises from a failed robbery during which one of the victims, Edgar Patricio, was shot in the chest and killed.

Defendant was charged by a grand jury with committing a knowing/purposeful murder in the course of a first-degree robbery. The murder charge was downgraded and the robbery charge dismissed pursuant to a plea bargain. As part of the plea agreement, defendant preserved the right to challenge pretrial evidentiary rulings made by the trial court.

On appeal, defendant contends that the trial court erred in denying his Wade/Henderson[1] motion to suppress out-of-court eyewitness identifications made by his cousin and by the victim's brother; both witnessed the shooting. Defendant further contends the trial court erred in denying his motion to suppress statements he gave to police during a custodial interrogation. Defendant argues that police violated his Fifth Amendment rights by reading the

---

[1] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

Miranda[2] warnings only after he had already responded to questions pertaining to where he lived. He also argues that the trial court erred in refusing to redact from the videorecorded interrogation statements he made to police that defendant contends are inadmissible under N.J.R.E. 404(b) because they relate to other crimes not charged in the present indictment. Finally, defendant, who was nineteen years old when the homicide was committed, contends the matter must be remanded for resentencing so the trial court can account for a statutory mitigating factor relating to youth, N.J.S.A. 2C:44-1(b)(14). That mitigating factor was enacted after the sentencing hearing was convened.

After carefully reviewing defendant's contentions in view of the record and the applicable principles of law, we affirm the convictions and the sentence that was imposed.

## I.

In September 2017, an Essex County grand jury returned a five-count indictment charging defendant with 1) first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1)(2); 2) first-degree robbery, N.J.S.A. 2C:15-1; 3) first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); 4) second-degree unlawful

---

[2]  Miranda v. Arizona, 384 U.S. 436 (1966)

possession of a weapon, N.J.S.A. 2C:39-5(b); and 5) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).

On June 28, 2018, the trial court convened an evidentiary hearing to consider defendant's contention that the statement he gave during an electronically-recorded custodial interrogation should be suppressed. Defendant argued that police failed to administer Miranda warnings before asking him to provide his home address—a fact the State intended to elicit at trial. In addition to his Fifth Amendment argument, defendant moved to redact certain statements that he and the interrogating detective made during the interrogation pursuant to N.J.R.E. 404(b) because those remarks revealed "other crimes."

The trial court denied defendant's Fifth Amendment suppression motion, concluding that police were not required to administer Miranda warnings before eliciting routine booking information. The court thus determined that the audio/video recording of the interrogation made pursuant to Rule 3:17 could be played to the jury.

The court granted defendant's application to redact from the recording references to defendant's violation of probation and his lack of employment. The court also redacted the detective's narrative expressing his own theory of

the case, and also ordered redaction of the concluding portion of the recorded statement when defendant exercised his right to counsel.

The court denied defendant's motion to redact a statement he made pertaining to his membership in a particular street gang and to dealing drugs. Defendant made the statements to explain why he would not commit a robbery at the location where this crime occurred. The court balanced the probative value against the risk of unfair prejudice and found those statements could be admitted with appropriate limiting instructions.

On August 7, 2018, and December 19, 2018, the trial court conducted a Wade/Henderson hearing to address defendant's motions to suppress out-of-court eyewitness identifications made by Nakia Cribb, defendant's cousin, and William Jimenez-Dominguez, the victim's brother. The court concluded that both identifications would be admissible at trial and that it was for the jury to decide their reliability and the weight to be given to them.

On April 9, 2019, defendant pled guilty to aggravated manslaughter (Count One of the indictment, as amended to reflect the downgrade from murder) and unlawful possession of a weapon (Count Five). The remaining charges, including first-degree robbery, were dismissed pursuant to the agreement. With the State's concurrence, defendant entered a conditional plea

pursuant to Rule 3:9-3(f), preserving his right to appeal the denial of his motion to suppress his statement under both Miranda and N.J.R.E. 404(b), as well as his motion to suppress the out-of-court identification evidence.

On May 29, 2019, the trial court sentenced defendant on the aggravated manslaughter conviction to a twelve-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the weapons conviction, the court imposed a seven-year term of imprisonment with a forty-two-month period of parole ineligibility as required by the Graves Act, N.J.S.A. 2C:43-6(c).[3] The court ordered the sentences to be served concurrently and further ordered them to run concurrently with a pre-existing Passaic County sentence for violating the terms of his Pre-Trial Intervention (PTI). PTI was imposed after defendant was convicted on two separate charges of third-degree possession of a controlled dangerous substance with intent to distribute. The court also recommended that defendant serve his sentence at a youth correctional facility due to his age and family support. The State's brief indicates that defendant is presently serving his sentence at Garden State Youth Correctional

---

[3] The Graves Act is named for Senator Francis X. Graves, Jr., who sponsored legislation in the 1980s mandating imprisonment and parole ineligibility terms for persons who committed certain offenses while armed with a firearm. The term now refers to all gun crimes that carry a mandatory minimum term of imprisonment.

Facility in accordance with the trial court's recommendation. This appeal follows.

II.

We discern the following facts from the plea hearing, the Wade/Henderson hearing, and the hearing on defendant's motion to suppress his statement to police.

On June 18, 2017 at around 5:30 a.m., Edgar Patricio, his brother William Jimenez-Dominguez, his cousin Darwin Loja, and two friends, Juan Tenepaw and Jonathan Cabrera, were walking home after spending time together playing soccer and then drinking some beer. The weather was clear and the sun had already risen. They encountered a man who approached them and demanded in English "marijuana or money." Patricio spoke English and tried to intervene by speaking to the assailant. The man shot Patricio in the chest and killed him. The failed robbery and ensuing homicide was captured on surveillance video.

Before the shooting, defendant's cousin, Nakia Cribb, was around Seventh Street in Newark when she saw defendant, who she called "Jazz" or "Jazzie." Cribb's mother and defendant's grandmother are sisters, and Cribb had known defendant his whole life. She spoke to defendant for a minute before she walked across the street.

Cribb saw defendant begin arguing with some men and heard defendant say, "Give me your money. Give me your money." Cribb heard gunshots and saw defendant shoot one of the men in the chest before running away. She heard a man screaming for help, went over to the bleeding man, and called 9-1-1. She told the 9-1-1 operator, "a young black man just shot a Hispanic man in the chest [and ran away]."

Later that day, Jimenez-Dominguez, the gunshot victim's brother, went to the police station and gave a description of the perpetrator. He told police it appeared that the woman who ran up and called 9-1-1 (Nakia Cribb) knew the perpetrator. The photo-array identification procedure was conducted the same day and was videorecorded. When police showed Jimenez-Dominguez a photo array consisting of six photographs, he selected defendant's photo from the array.

Around 1:20 p.m. that afternoon, police brought Cribb to the station to give a statement and confirm the identity of the shooter. She described defendant as being 6'4" tall with dreadlocks down his back. She identified a photograph of defendant.

Police went to defendant's house on Prospect Street in East Orange, arrested him and transported him to the Essex County Prosecutor's Office

8

(ECPO) Homicide Task Force headquarters.[4]  There defendant learned he was being charged with murder.

The ensuing custodial interrogation was electronically recorded in accordance with Rule 3:17.  The interrogation was conducted by ECPO Detectives Kenneth Poggi and Eric Manns.  Detective Poggi asked defendant preliminary questions, including defendant's name, birthdate, address, educational background, and whether he could read, write, and understand English.  The detective then administered Miranda warnings.  Defendant waived his Fifth Amendment rights and told the interrogating detectives that he was unemployed and thought that he had been arrested for a PTI violation.  When the detective accused defendant of committing a robbery and murder, defendant denied involvement in the crime.  Defendant explained, "I don't do violent crimes. I sell drugs.  Ya'll feel me;" "I ain't gonna lie to you, I sell drugs;" and "I'm a [Crip] . . . we saw a lot of the Bloods so we don't go nowhere."

Defendant confirmed where he lived.  He explained who he lived with, and where he was at the time of the murder.  In an apparent attempt to assert an alibi, he said that he watches his nieces and nephews every morning and every night.

---

[4]  Defendant does not challenge the lawfulness of the arrest.

Detective Poggi explained his own theory of the robbery-homicide based on what he saw on the surveillance videos, punctuated by occasional responses from defendant. Approximately seventeen minutes after questioning had begun, defendant said that he wanted to speak with an attorney. The detective immediately ended the interrogation.

Defendant raises the following contentions for our consideration in his counseled brief:

> POINT I:
>
> THE IDENTIFICATIONS MADE BY MS. CRIBB AND MR. JIMINEZ-DOMINQUEZ POSED A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION, AND THEREFORE, SHOULD HAVE BEEN SUPPRESSED.
>
>> A. THE SHOWUP IDENTIFICATION MADE BY MS. CRIBB, A WOMAN WHO WAS BLIND IN ONE EYE AND ADMITTED HAVING POOR VISION IN THE OTHER EYE, WAS HIGH ON HEROIN AND CRACK AT THE TIME OF THE INCIDENT AND THE SHOWUP PROCEDURE, AND WHOSE DESCRIPTION OF THE PERSON SHE THOUGHT SHE SAW DID NOT MATCH MR. BULLOCK, PRESENTED A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.

A-0537-19

i. A SHOWUP PROCEDURE IS INHERENTLY SUGGESTIVE—ESPECIALLY WHEN IT IS CONDUCTED MORE THAN TWO HOURS AFTER THE EVENT—AND THERE IS NO "FAMILIARITY" EXCEPTION TO THIS GENERAL PRINCIPLE.

ii. A PROPER ASSESSMENT OF THE SYSTEM AND ESTIMATOR VARIABLES REVEALS THAT MS. CRIBB'S IDENTIFICATION PRESENTED A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION

B. THE IDENTIFICATION MADE BY MR. JIMENEZ-DOMINGUEZ PRESENTED A VERY SUBSTANTIAL LIKELIHOOD OF MISIDENTIFICATION BECAUSE THE DEFENDANT STOOD OUT FROM THE OTHER PHOTOGRAPHS, THE WITNESS WAS UNDER THE STRESS OF WITNESSING HIS BROTHER BEING SHOT TO DEATH, AND HE WAS REPEATEDLY EXPOSED TO FEEDBACK WHEN SPEAKING TO ANOTHER EYEWITNESS ABOUT THE INCIDENT AND THE SHOOTER.

POINT II:

THE MOTION COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO REDACT OTHER BAD ACT EVIDENCE AND

11

MR. BULLOCK'S ADDRESS FROM THE CUSTODIAL STATEMENT.

    A. THE COURT'S REFUSAL TO REDACT THE PRIOR BAD ACT EVIDENCE CONTAINED WITHIN MR. BULLOCK'S CUSTODIAL STATEMENT WARRANTS REVERSAL.

    B. MR. BULLOCK'S COMMENTS REGARDING HIS ADDRESS FALL OUTSIDE THE SCOPE OF THE ROUTINE BOOKING EXCEPTION BECAUSE THE DETECTIVE KNEW OR SHOULD HAVE KNOWN THAT ASKING ABOUT MR. BULLOCK'S ADDRESS WAS LIKELY TO ELICIT AN INCRIMINATING RESPONSE

POINT III:

THE LAW REQUIRING SENTENCING MITIGATION FOR YOUTHFUL DEFENDANTS DEMANDS RETROACTIVE APPLICATION BECAUSE THE LEGLISLATURE INTENDED IT, AS GLEANED BY ITS AMELIORATIVE PURPOSE AND THE LEGISLATIVE INTENT. MOREOVER, ACCORDING THE STATUTE RETROACTIVITY WOULD NOT RESULT IN A MANIFEST INJUSTICE TO THE STATE.

Defendant also filed a pro se supplemental letter. That letter does not include point headings. The gravamen of defendant's pro se contentions are that

12

A-0537-19

my motions took place in a rushed and unorganized way. The [j]udge was fair but in a case where a person is being accused of the most horrific crime and by default if convicted will change his/her life then, fairness isn't enough. While I had my Wade [m]otion, a [Rule] 404(b) motion was conducted and a Miranda [m]otion was conducted. To my understanding those all are separate motions that generally calls for separate dates. . . . Even as I was taken into custody confused and resistless, I wasn't read my Miranda Rights. I was subject to listen to narrative from a detective who isn't an eyewitness. He narrated what he thought happened from watching a foggy video and from taking statements from people later to be found as drug abusers with criminal backgrounds far more extensive than some drug lords.

## III.

We first address defendant's contentions that the trial court erred in ruling that the out-of-court identifications made by Cribb and Jimenez-Dominguez would be admissible at trial. We begin by acknowledging the legal principles governing the admissibility of eyewitness identification evidence.

In State v. Henderson, the Court recognized "that eyewitness '[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country.'" 208 N.J 208, 231 (2011) (alteration in original) (quoting State v. Delgado, 188 N.J. 48, 60 (2006)). The Court reviewed confounding circumstances, including various "estimator" variables (e.g.,

13

lighting conditions, distance, and stress) and "system" variables (i.e., the manner in which police administered a photo array procedure or conducted a one-on-one show up procedure) that influence a witness's ability to accurately identify a culprit. Id. at 247, 289–90.

When administering a photo identification procedure, the person administering the procedure should include only one suspect in the array, presented along with photos of at least five look-alikes that "generally fit the witness' description" of the perpetrator. Id. at 251–52 (citation omitted).

> Because of the pivotal role identification evidence plays in criminal trials, and the risk of misidentification and wrongful conviction from suggestive behavior—whether by governmental or private actors—a private actor's suggestive words or conduct will require a preliminary hearing under Rule 104 in certain cases to assess whether the identification evidence is admissible.
>
> [Id. at 326. (emphasis added).]

The threshold for suppression of identification evidence is high. In State v. Chen, decided on the same day as Henderson, the Court recognized that "[e]yewitness identification testimony . . . must be sufficiently reliable to be able to prove or disprove a fact[,] and its probative value cannot be substantially outweighed by the risk of undue prejudice or misleading the jury . . . ." 208 N.J.

14

307, 326 (2011).  The Court in <u>Henderson</u> retained the general rule that, "if after weighing the evidence presented [at a <u>Wade</u> hearing] a court finds from the totality of the circumstances that defendant has demonstrated <u>a very substantial likelihood of irreparable misidentification</u>, the court should suppress the identification evidence."  <u>Henderson</u>, 208 N.J. at 289 (emphasis added).

The Court made it clear that while trial courts are expected to "weed out unreliable identifications," <u>id.</u> at 302, the suppression remedy is to be used reservedly, not reflexively, or often.  "It is the jury's task to determine how reliable . . . evidence is, with the benefit of cross-examination and appropriate jury instructions.  <u>Chen</u>, 208 N.J. at 328.  Only in the rare case that an identification procedure will be so highly suggestive as to "taint the reliability of a witness' identification testimony" will it be appropriate to bar that evidence altogether.  <u>Ibid.</u>

A.
Cribb Identification

At the <u>Wade</u>/<u>Henderson</u> hearing, the State established that 1:21 p.m. on June 18th—the day of the shooting—Cribb was brought to the ECPO task force headquarters.  We note that was more than two hours after the shooting.  Cribb was shown three photographs and was asked to identify the three persons

depicted in those photos.[5]  Cribb said the first photograph depicted "Rob G.,"
who was also her cousin and defendant's older brother.  Cribb did not recognize
the person depicted in the second photograph.  When police showed her the third
photograph, she confirmed that it depicted defendant, who she referred to as
"Jazzie."  She explained that defendant was her cousin,[6] and confirmed that he
was the man who walked up and shot the victim.  Cribb testified that she knew
defendant his entire life and saw him "[a]lmost every day" in the neighborhood.

Cribb acknowledged at the hearing that she had been using drugs and was
high both at the time of the homicide and during the stationhouse identification
procedure.  She also acknowledged that she is blind in one eye and that her
vision out of her other eye is "poor."  Her vision problems cause her to use a
walking stick so that she did not walk into things.

After considering the applicable system and estimator variables, the trial
court denied defendant's motion to suppress Cribb's identification testimony,

---

[5]  The State does not assert that the detectives had constructed a "photo array"
or that two of the three photographs were intended to serve as "filler" photos.
Rather, detectives were asking Cribb to identify three different individuals who
were suspected of committing the homicide.

[6]  At the hearing, defendant was described as Cribb's first cousin.  Cribb testified
that defendant is her mother's sister's daughter's son.  As defendant notes in his
appeal brief, that would make defendant Cribb's first cousin, once removed. That
label does not change the fact that Cribb has known defendant his entire life.

16

concluding there was no substantial likelihood of misidentification. The trial court nonetheless recognized:

> There are absolutely issues with Nakia Cribb's identification, in that she was using, my recollection, cocaine and heroin at the time of the incident; that she does have sight issues . . . . One eye, she was blind in previously and the other, she described had—having issues. That . . . is clearly the case. [M]y recollection is that she did not tell the detectives about identifiers of the defendant; i.e., facial, neck tattoos, and something that this defendant has. And—and—and there may be a bias that—that she has.

The trial court found that Cribb had known defendant his entire life and had "seen him every day for years." The court concluded that although there were issues concerning her drug use and vision problems, those circumstances were for the jury to consider in determining the weight to give to her identification testimony, not its admissibility. We believe the trial court's findings of fact and law are supported by credible evidence in the record and we have no reason to overturn them.

Defendant contends that Cribb's identification was unreliable and should have been suppressed because the detective did not show her an array with fillers. Rather, defendant contends, the procedure was essentially a single-photo showup identification—one that was conducted more than two hours after the

robbery-homicide. We agree this was essentially a single-photo lineup that in most instances would constitute an inherently suggestive showup identification. However, strict compliance with the procedures spelled out in Henderson for administering a photo array was not required in this case because this was a "confirmatory" identification.

The detective explained that she showed Cribb a single photograph of defendant, rather than a photo array with fillers, because Cribb and defendant were cousins and Cribb said she knew defendant his whole life. As our Supreme Court explained in State v. Pressley, an identification procedure is not considered to be suggestive "when a witness identifies someone he or she knows from before but cannot identify by name." 232 N.J. 587, 592–93 (2018) (citing National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 28 (2014)). By way of example, the Court observed that the person identified "may be a neighbor or someone known only by a street name." Id. at 593 (citing Identifying the Culprit, at 22); see also State v. Herrera, 187 N.J. 493, 507 (2006) (finding fact that defendant was not a stranger to victim "significant, if not controlling.").

In this instance, Cribb's relationship to and familiarity with defendant is much closer than that needed to invoke the confirmatory identification doctrine.

18

Far from being a stranger, Cribb knew defendant from the time he was born. Importantly, not only did she often see defendant in the neighborhood, but she had just spoken with him seconds before the fateful encounter. In these circumstances, police were not required to compile and administer a photo-array, and the failure to do so does not render the identification procedure suggestive or unreliable.

We add that, despite her drug use and vision problems, Cribb's account of the robbery-homicide encounter was entirely accurate. She described how defendant approached the individuals, demanded money, and shot the victim in the chest. The accuracy of the account she gave in her recorded statement is confirmed by the surveillance video. In these circumstances, the trial court correctly determined that her identification testimony should be heard by the jury. See Henderson, 208 N.J. at 303.

### B.
### Jimenez-Dominguez

Because Jimenez-Dominguez's first language is Spanish, the out-of-court identification procedure was conducted in Spanish. The police provided preliminary instructions. In addition to the standard instructions, Jimenez-Dominguez was told not to speak with anyone about his identification.

A detective who had no knowledge of the case served as a double-blind administrator, see supra note 5, showing Jimenez-Dominguez six photographs, one at a time. Jimenez-Dominguez chose the second photograph as depicting the man who shot and killed his brother. That photograph depicted defendant.

After reviewing the photographs, the transcript of the recorded identification procedure, and the witness's testimony at the hearing, the trial court denied defendant's motion to suppress Jimenez-Dominguez's identification testimony, finding the procedure was properly conducted and not suggestive. The court added that any questions concerning estimator variables, such as whether the witness was sober at the time of the crime, went toward the weight to be given by the jury to the identification evidence, not its admissibility.

Defendant contends the identification made by Mr. Jimenez-Dominguez was the result of an impermissibly suggestive photo array, claiming that defendant's photograph improperly stood out from the filler photographs in the array. Specifically, defendant argues: (1) the photo of defendant is darker than the other photos; (2) defendant's photo is the only one where the subject's

shoulders are exposed;[7] (3) defendant's photo shows his dreadlocks mostly pulled back;[8] and (4) defendant's photo is one of only two where the depicted individual has facial hair.[9]

As we have noted, Henderson explains that filler photos should be "lookalikes." 208 N.J. at 251. In accordance with Henderson, the Attorney General has promulgated guidelines for administering photo arrays and lineup identifications. See Off. of the Att'y Gen., Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures 1 (2001) (Guidelines).[10] The Guidelines require "fillers who generally fit the witness' description" of the suspect. Ibid.

---

[7] Based on our own review of the photos, defendant appears to be wearing a sleeveless undershirt, whereas the other photos depict men wearing crew-neck shirts and a collared sweatshirt/hoodie.

[8] We note the first photo also shows an individual whose dreadlocks are mostly pulled back. Of the other four filler photographs, two show individuals whose dreadlocks are partially pulled back and two others show individuals whose dreadlocks are unbound.

[9] Our own review shows that four of the five individuals in the filler photographs appear to have thin mustaches.

[10] We note that the Guidelines have recently been updated, and now provide, "fillers should resemble the suspect in significant features, such as gender, race, skin color, facial hair, age, and distinctive physical characteristics." See Off. of

We have reviewed the array and decline to substitute our judgment for that of the trial court with respect to its composition. We also reject defendant's argument that estimator variables cast substantial doubt upon the reliability of Mr. Jimenez-Dominguez's identification. We are satisfied for example, that Jimenez-Dominguez's consumption of three beers over a five-hour period did not so affect the reliability of the identification as to render it inadmissible. We note the statement Jimenez-Dominguez gave to police accurately described the crime as shown in the surveillance video.

We also reject defendant's claim that Jimenez-Dominguez's identification was tainted by feedback from his cousin. That contention is belied by the record. The transcript of Jimenez-Dominguez's identification of defendant shows that he identified defendant on June 19, 2017, around 1:46 p.m. As we have noted, police instructed him not to speak with anyone about his identification. Jimenez-Dominguez testified that he spoke with his cousin Loja four days after the shooting—three days after the identification—then one week later, and not again. He testified that he never discussed his identification with any of the men who were present at the shooting.

---

the Att'y Gen. <u>Attorney General Guidelines for Preparing and Conducting Out-Of-Court Eyewitness Identifications</u> 3 (issued Feb. 9, 2021).

A-0537-19

In any event, the trial court correctly held that it is for a jury to decide the reliability of Jimenez-Dominguez's identification, with the benefit of cross-examination and jury instructions that explain the relevant system and estimator variables and the risk of misidentification.

IV.

We next address defendant's contention that manner in which ECPO detectives conducted his custodial interrogation violated his Fifth Amendment rights. Specifically, defendant argues that detectives elicited information pertinent to a potential alibi defense—where defendant lived—before administering Miranda warnings. We discern the following facts from the Miranda hearing that pertain to defendant's constitutional argument.

Defendant was arrested at his home on June 22, 2018, four days after the homicide. The custodial interrogation started at around 11:00 a.m. Detective Poggi provided coffee to defendant, introduced himself, and asked defendant for background information consisting of his name, date of birth, home address, and the extent of his education. Defendant provided his name and birthdate. He also provided his home address at a multi-family apartment building on Prospect Street in East Orange. That was the same address at which defendant had been

arrested. Defendant explained that he went to school up to and including the twelfth grade, and ultimately received a GED.

After confirming defendant could read, write, and understand English, Detective Poggi advised defendant he had been charged with homicide and informed him of his <u>Miranda</u> rights. Defendant waived his rights, writing his initials after each right on the notification-of-rights form to acknowledge that he understood each of them. Poggi then read the waiver portion of the form, and asked defendant if he understood the provisions and whether they were all true. Defendant said he understood and that "[a]ll of that is true"—meaning he was willing to answer questions, knew what he was doing, and no threats or promises had been made. Defendant then printed his name on the signature line.

During his recorded interview, defendant made certain statements acknowledging where he lived, who he lived with, and where he was at the time of the murder. He said, for example, that he watches "the kids" every morning and every night, referring to his nieces and nephews whom he said lived with him.

Poggi acknowledged at the suppression hearing that three days before the interrogation he learned that a cab driver had dropped off a passenger suspected of being involved in the shooting at the apartment building on Prospect Street

in East Orange. Poggi also knew that defendant had been arrested at his residence on Prospect Street earlier that day. Poggi explained that it is always standard procedure to ask basic pedigree information before starting a custodial interrogation, including the interrogee's address, to establish the identity of the person giving the statement.

The trial court ruled that Miranda warnings were not required before asking defendant where he lived. The court found that the detective routinely asks standard pedigree questions before conducting an interrogation and that those questions were not designed to elicit an incriminating response as defendant contends.

We begin our analysis by acknowledging the governing legal principles. As our Supreme Court noted in State v. Hreha,

> [w]hen faced with a trial court's admission of police-obtained statements, an appellate court should engage in a "searching and critical" review of the record to ensure protection of a defendant's constitutional rights. See State v. Pickles, 46 N.J. 542, 577 (1966). That review, however, does not generally involve "an independent assessment of the evidence as if [the reviewing court] were the court of first instance." State v. Locurto, 157 N.J. 463, 471 (1999). Instead, an appellate court should typically defer to the trial court's credibility and factual findings, recognizing that the trial court's findings are often "substantially influenced by [its] opportunity to hear and see the witnesses and to

have the 'feel' of the case." State v. Johnson, 42 N.J. 146, 161 (1964) (alteration in original).

[217 N.J. 368, 381–82 (2014).]

The Court in Hreha further explained,

An appellate court's review of the trial court's findings is limited to confirming only that "those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (internal quotation marks omitted). If that standard is satisfied, the reviewing court's "task is complete[,] and it should not disturb the result, even though . . . it might have reached a different conclusion were it the trial tribunal." Johnson, 42 N.J. at 162 (alteration in original).

[Id. at 382.]

However, a trial court's legal conclusions are subject to de novo review. Id. at 382 (citing State v. Gandhi, 201 N.J. 161, 176 (2010)).

It is axiomatic that a confession obtained during a custodial interrogation may not be admitted in evidence unless law enforcement officers first informed the defendant of his or her constitutional rights. Miranda, 384 U.S. at 444. However, the general requirement that custodial interrogations must be prefaced by the administration of Miranda warnings and the knowing and voluntary waiver of Miranda rights does not necessarily apply to all questions posed to a person in police custody. The "'routine booking question' exception . . . exempts

26

from <u>Miranda</u>'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'" <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990); <u>State v. Mallozzi</u>, 246 N.J. Super. 509, 515 (App. Div. 1991). Because <u>Miranda</u> applies only where there has been police interrogation, "booking procedures and the routine questions associated [with that process] are ministerial in nature and beyond the right to remain silent." <u>State v. Bohuk</u>, 269 N.J. Super. 581, 593 (App. Div. 1994) (alteration in original) (quoting <u>Mallozzi</u>, 246 N.J. Super. at 515). We have held that asking an arrestee where and with whom he lived is "ministerial in nature," and did not amount to custodial interrogation. <u>State v. Cunningham</u>, 153 N.J. Super. 350, 352 (App. Div. 1977).

In this instance, the trial court credited Detective Poggi's testimony that that it is his standard practice to ask basic pedigree information, including an address, to establish the identity of the person giving the statement. We see no reason to overturn that finding. We thus conclude there is no basis for us to find that the detective's purpose in asking for defendant's address as part of the pedigree information was designed or reasonably likely to elicit incriminating information. <u>Cf.</u> <u>Cunningham</u>, 153 N.J. Super. at 354 ("The intent or purpose of the detective in asking the questions of a defendant may be material in making a determination as to whether defendant has been subjected to custodial

interrogation in violation of his constitutional rights, but is only one of the factors to be considered in analyzing the total situation surrounding the questioning. Such an issue is to be resolved by a consideration of all the circumstances involved.").

But, even assuming for the sake of argument that it was improper for the detective to pose a question concerning defendant's address before administering Miranda warnings, any such error would be harmless in the circumstances of this case. As our Supreme Court explained in State v. Maltese,

> To warrant reversal, defendant must show not only that admission of his statement was error, but that it was error "of such a nature to have been clearly capable of producing an unjust result." R. 2:10-2. In cases in which admitted evidence implicates a constitutional right, the reviewing court must determine whether the alleged error was "harmless beyond a reasonable doubt." State v. Weaver, 219 N.J. 131, 154 (2014) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)); see State v. Sanchez, 129 N.J. 261, 278–79 (1992) (holding admission of confession was harmful error because it was "uncertain whether the error may have contributed to defendant's conviction").

> [222 N.J. 525, 543–44 (2015).]

In this instance, defendant's address was not necessarily incriminating. Nor could it be disputed. Police had independent evidence of his address, and in fact had arrested him there before the custodial interrogation. Accordingly,

the admission of defendant's answer, although it was given before <u>Miranda</u> warnings were administered, could not produce an unjust result.

V.

We next address defendant's contention that the trial court erred by failing to redact certain portions of the videorecorded interrogation that would be played to the jury. Specifically, the judge ordered the State to redact Detective Poggi's theory of the case, all references to defendant's lack of employment, and to defendant's potential violation of PTI or probation.

During the custodial interrogation defendant denied involvement in the murder, explaining he does not commit violent crimes and only sells drugs. He also explained that he was not at the location where the robbery-homicide occurred because he had seen Bloods there, and he is a Crip.

The judge denied defendant's request to redact defendant's references to his gang affiliation and drug dealing, explaining that a curative instruction would cure any risk of prejudice. The trial court also ruled that the State could not use these statements in summation or otherwise repeat them in its presentation to the jury.

We begin our review of the trial court's redaction decision by acknowledging that N.J.R.E. 404(b) generally precludes the admission of

29

evidence pertaining to other crimes or wrongs, except to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue of dispute." In State v. Vallejo, the Supreme Court recognized that "[o]ther crimes evidence is considered highly prejudicial." 198 N.J. 122, 133 (2009) (citing State v. Stevens, 115 N.J. 289, 309 (1989)). While evidence of past crimes or wrongs may be relevant and admissible for some purposes, such evidence cannot be introduced to show a defendant's propensity towards criminal conduct, State v. Pitts, 116 N.J. 580, 602 (1989), or to show that he or she is a "bad person in general," State v. Foglia, 415 N.J. Super. 106, 123 (App. Div. 2010). As the Court explained in Vallejo, "[t]he risk involved with such evidence is 'that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself.'" 198 N.J. at 133 (quoting State v. G.S., 145 N.J. 460, 468, (1996)).

We also acknowledge that "[a]lthough evidence of membership in a street gang is not [necessarily] evidence of actual criminal activity, it is at the very least strongly suggestive of such activity." State v. Goodman, 415 N.J. Super. 201, 227 (App. Div. 2010). We added in Goodman that "[t]he mere fact, or even

allegation, of gang membership carries a strong taint of criminality." Ibid. (alteration in original) (citation omitted).  Accordingly, we

> conclude[d] that N.J.R.E. 404(b) is applicable here because the average juror would likely conclude that a gang member has engaged in criminal activity.  Such evidence has the potential to "taint" a defendant in much the same way as evidence of actual criminal conduct.
>
> [Ibid.]

In this instance, the State did not propose to introduce independent evidence of defendant's gang membership, but rather only to introduce defendant's own statement.  That circumstance does not exempt this evidence from the requirements imposed under N.J.R.E. 404(b).  In State v. Covell, our Supreme Court confirmed that a defendant's statement, which was admissible under N.J.R.E. 803(b)(1), still had to pass muster under N.J.R.E. 403—that is, its probative value must not have been substantially outweighed by the risk of undue prejudice.  157 N.J. 554, 574 (1999); see also State v. Vargas, 463 N.J. Super. 598, 611 (App. Div.), certif. denied, 244 N.J. 302 (2020) (noting "a defendant's statement about a prior crime, wrong or act—even if it satisfies a hearsay exception—must overcome the N.J.R.E. 404(b) hurdle").

However, evidence of gang membership is not so inherently prejudicial that it must be categorically excluded.  See State v. Torres, 183 N.J. 554, 573

31

(2005) (ruling evidence about defendant's gang involvement was admissible and relevant; outlining cases in other jurisdictions that allow such testimony to show motive); Goodman, 415 N.J. Super. at 228–30 (holding evidence of gang membership was properly admitted under N.J.R.E. 404(b) to prove motive). Nor is evidence of drug dealing so inherently prejudicial that exclusion is categorically required. See State v. Hernandez, 170 N.J. 106, 129 (2001) (holding testimony about other "temporally proximate" drug deals could be admitted to counter defendant's version of events); State v. Allen, 337 N.J. Super. 259, 269 (App. Div. 2001) (concluding testimony that murder victim went to buy drugs from defendant admissible); State v. Green, 274 N.J. Super. 15, 31–32 (App. Div. 1994) (finding defendant's participation in drug sales admissible in murder trial).

In State v. Cofield, the Court established a four-part test to determine the admissibility of other-acts evidence:

> 1) The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2) It must be similar in kind and reasonably close in time to the offense charged;
>
> 3) The evidence of the other crime must be clear and convincing; and

4) The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. 328, 338 (1992).]

Importantly for purposes of this appeal, our review of a trial judge's determination on the admissibility of "other bad conduct" evidence is one of great deference. The admissibility of evidence at trial is left to "the sound discretion of the trial court." State v. Willis, 225 N.J. 85, 96 (2016). A trial court's evidentiary ruling is therefore reviewed on appeal for abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011). Accordingly, trial court rulings regarding other-crimes evidence made pursuant to Rule 404(b) are reversed "[o]nly where there is a clear error of judgment." Id. at 157–58 (alteration in original) (quoting State v. Barden, 195 N.J. 375, 391 (2008)). However, appellate review is de novo is when the trial court should have, but did not perform a Cofield analysis. See State v. Green, 236 N.J. 71, 81 (2018) (recognizing appellate courts review de novo when the trial judge "should have, but did not perform a Cofield analysis."); see also State v. Reddish, 181 N.J. 553, 609 (2004) (quoting Barden, 195 N.J. at 391) (noting that when the trial court fails to analyze other crimes evidence under Cofield, "we undertake a plenary review to determine whether the other-crimes evidence was admissible[]").

33

In this instance, the trial court considered some but not all of the Cofield factors. We therefore conduct our own analysis of whether the probative value of the evidence was outweighed by its apparent prejudice.

"To satisfy the first prong of the Cofield test—the relevancy prong—the evidence must have 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" Rose, 206 N.J. at 160 (quoting N.J.R.E. 401). This is a "generous" standard, requiring only that "the evidence makes a desired inference more probable than it would be if the evidence were not admitted . . . ." Ibid. (quoting State v. Williams, 190 N.J. 114, 123 (2007));

In this instance, after the detectives accused him of robbery and murder, defendant admitted he was a Crip and a low-level drug dealer in an apparent effort to convince the detectives that he did not commit the murder since it occurred in Bloods' territory. Defendant's statements were thus relevant to a material issue, that is, the perpetrator's identity, and defendant's opportunity and motive.

As to the second factor, we note that in Williams, the Court recognized that the requirement that the "other acts" be similar in kind and reasonably close in time, may have been pertinent to the facts presented in Cofield but "need not receive universal application in Rule 404(b) disputes." 190 N.J. at 131. Rather,

"[the second factor's] usefulness as a requirement is limited to cases that replicate the circumstances in <u>Cofield</u>.  In the instant analysis, application of prong two serves no beneficial purpose and, therefore, we disregard it as unnecessary."  <u>Ibid.</u>

Here too, the second factor seems to have only limited application to the admissibility of a defendant's own admission that he is a gang member and drug dealer.  We add that it can be readily inferred that defendant was referring to his status at the time of the robbery-murder and thus his admission refers to criminal activity reasonably close in time for purposes of the second factor.

Also as in <u>Williams</u>, the clear and convincing standard set forth in the third <u>Cofield</u> factor is not at issue and warrants little discussion.  <u>Ibid.</u> Defendant voluntarily admitted his own involvement with the Crips and dealing drugs.  The State was not required to prove that statement by independent evidence.  Indeed, the trial court barred any such additional evidence.[11]

---

[11]  We note that the trial court went so far as to prohibit the prosecutor at trial from commenting on defendant's admission to police that he was a gang member and a drug dealer.  That precaution seems curious in view of the court's determination that defendant's remarks are admissible since prosecutors are generally permitted in closing argument to comment on the evidence.  However, we see no abuse of discretion in imposing that restriction on the prosecutor

As to the fourth Cofield factor, here, as in Williams, "[t]he key issue in respect of this evidence is clearly the weighing of the evidence's prejudicial effect as against its probative value." Ibid. As we have noted, the trial court carefully considered that factor and we agree with the trial court's conclusion.

In rendering its decision, the trial court emphasized that it would provide a limiting instruction to ensure that defendant's remarks would not be used to show his propensity to commit crime. In Cofield, the Court held that once evidence is found to be admissible, "[t]he [trial] court must instruct the jury on the limited use of the evidence." 127 N.J. at 340–41. "[T]he court's instruction," the Court added, "'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" Ibid. (quoting State v. Stevens, 115 N.J. 289 (1989)).

In this case, the trial court had no opportunity to draft and deliver an appropriately tailored instruction because defendant pled guilty. We decline to presume that the limiting instruction would have been deficient or that the jury would not have followed it. See State v. Herbert, 457 N.J. Super. 490, 503–04 (App. Div. 2019) ("[C]ourts presume [that] juries follow instructions.").

In sum, we agree with the trial court that with proper instructions, the probative value of defendant's statement to police explaining why he did not commit the robbery-murder outweighed the risk of prejudice. But even assuming for the purposes of argument that defendant's remarks about being a member of the Crips and a drug dealer needed to be redacted from the videorecording of the interrogation before being played to the jury, we believe any error in failing to do so would have been harmless.[12] See Maltese, 222 N.J. at 543–44. Defendant's references to being a Crip and low-level drug dealer were fleeting and isolated. They did not include any violent or graphic details. Furthermore, these fleeting remarks embedded in his interrogation must be viewed in context with the other evidence the State would have marshalled at trial, including the videorecording of the crime, the positive identification made

_____

[12] As defendant notes in his appeal brief, "[w]here a defendant enters a conditional guilty plea (as was done here) and prevails on appeal, the matter is to be remanded to provide the defendant with the opportunity to elect whether to withdraw the guilty plea and proceed to trial." R. 3:9-3(f); State v. Cummings, 184 N.J. 84, 100 (2005); State v. Wright, 444 N.J. Super. 347, 367 (App. Div. 2016). We note that defendant pled guilty pursuant to a plea agreement that allowed him to avoid a mandatory minimum thirty-year parole ineligibility term for murder and a possible consecutive NERA sentence for armed robbery. If defendant were to opt for a trial and is convicted of murder, the mandatory minimum term of parole ineligibility that would be imposed is almost three times longer that the NERA period of parole ineligibility that he is now serving.

by Jimenez-Dominguez, and his cousin's testimony that she not only saw defendant fire the fatal shot but had spoken with him seconds before the shooting.

VI.

Finally, we address defendant's contention that we must remand for a new sentencing proceeding at which the trial court must consider a new statutory mitigating factor that accounts for a defendant's youth. N.J.S.A. 2C:44-1(b)(14) now includes as a mitigating circumstance that, "[t]he defendant was under [twenty-six] years of age at the time of the commission of the offense." As we have noted, defendant was nineteen years old when the homicide was committed. The new mitigating factor was adopted by L. 2020, c. 110, §1 on October 19, 2020, twenty-six months before the present crime, and eighteen months before the sentencing hearing in this case.

The question of whether the new mitigating factor applies retroactively is presently before the New Jersey Supreme Court in State v. Lane, __ N.J. __. The Court heard oral argument in February and its decision is now pending.

We add that in the matter before us, it is clear that the sentencing court did consider and in fact relied heavily upon defendant's youth. Defense

counsel's first sentencing argument urged the judge to consider defendant's youth as a mitigating factor:

> Your Honor, I'm asking that you consider as a mitigating factor Mr. Bullock's youth. Tyrie was [nineteen] years old at the time of this offense. And, although State v. Zuber talks about mitigating qualities of youth in reference to folks younger than [eighteen], the social science upon which it relies deals with youth all the way up to about age [twenty-four]. In talking with Tyrie during this case, and, in reviewing the letters that were previously turned over to the [c]ourt, I think it's clear that Mr. Bullock already has many positive qualities, and, shows a lot of promise for the future. But, particularly as it relates to this case, over the past almost two years at this point, I have really observed Tyrie's thought process, and, his processing of this whole experience evolve, and, for him to really gain a longer term perspective about how to think about this as it relates to what happened, and, also to himself, and, what it means for his future.

The assistant prosecutor acknowledged defendant's youth as well, stating:

> What—what is a shame, Judge, is that we have a young man here who clearly has family, has support, has things that a lot of defendants don't have. We've heard what a—what a sharp mind he has. And, regardless of whatever sentence Your Honor does impose upon him today, he is fortunately young enough that he can recover from this. . . . The defendant at the time of this offense was [nineteen] years old. He's [twenty-one] now, but, at the time of this offense, he—he was [nineteen]. So, I understand the argument with regards to his youth being as a mitigating factor. I understand as well his character, and[] attitude. The State believes that he genuinely is showing remorse, that his family is

A-0537-19

showing remorse in this case. He's accepted his culpability in this case.

In deciding to impose a twelve-year prison term significantly below the fifteen-year midpoint of the ten- to thirty-year first-degree sentencing range, the judge also acknowledged defendant's young age at the time he killed the victim. The judge further explained, "I'm going to recommend that he serve at the youth correctional facility. And, that I think at age [twenty-one], he should not be in a facility, even as Northern State, or, Eastern State, which is in Rahway, or, particularly not Trenton State. That for his age, and, for his record that is so light, that he should be in the youth correctional institute complex."

In sum, we conclude that the trial court has already accounted for defendant's youth and so a remand would not be needed even if N.J.S.A. 2C:44-1(b)(14) were to be given retroactive application.

Any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0537-19